[Cite as *State v. Howard*, 2014-Ohio-2176.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 100094

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LEDON HOWARD

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-566854-A

**BEFORE:** McCormack, J., S. Gallagher, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** May 22, 2014

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, OH   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: James M. Rice
Brett Hammond
Assistant County Prosecutors
8th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

**{¶1}** Ledon Howard appeals from a judgment of the Cuyahoga Court of Common Pleas that convicted him of felonious assault after a jury trial and sentenced him to three years in prison. On appeal, Howard raises claims regarding the law enforcement's administration of the photo lineup procedure and the state's failure to provide him with a transcript of an audiotaped statement by a witness to the police. He also claims the trial court imposed the prison term consecutive to an existing prison term in an unrelated case without making the requisite findings. For the following reasons, we affirm Howard's conviction, but reverse his consecutive sentences and remand for further proceedings consistent with this opinion.

## Evidence Presented at Trial

**{¶2}** Howard was charged with felonious assault for striking Shawna Mackey and breaking her jaw during a drug transaction gone awry. At the jury trial, Mackey testified that Howard had been introduced to her by Floyd McGee, a neighbor, three weeks before the incident. She bought drugs from Howard, and their relationship turned sexual at one point. In the early hours of August 16, 2012, around 2:30 a.m., after she was drinking for some time, her friend "Melvin" came over and they decided she would call Howard to purchase crack cocaine. At this time, McGee also joined them. When Howard arrived, Mackey got inside his vehicle, a blue Sonata. Howard was unhappy that Mackey only brought $7 for the transaction. Because she still owed him $5 dollars from previous drug buys, Howard snatched the $7 from Mackey's hand without giving her the drug, and ordered her to get out his car. The two began to argue loudly. Their argument drew the

attention of her neighbors, Christopher Poole and Pasueall Nance. After she exited the car, she walked past Poole and McGee toward her apartment building. When she turned around, Howard hit her in her jaw. She "went straight to the ground," breaking her jaw.

{¶3} After she fell, McGee pushed Howard back and stopped Howard from hitting her again. She got up and went to her house to call 911. When the police arrived, she provided the police with Howard's phone number and told the police she knew him as "D."

{¶4} Mackey testified that she identified Howard in a photo lineup. She indicated 80 percent certainty at the photo lineup because the picture was a little fuzzy. However, she knew with 100 percent certainty that the person who punched her was Howard. When asked if she was able to see it was Howard who hit her, she answered "definitely." Mackey also identified Howard in court.

{¶5} McGee testified that he knew Howard since Howard was 15. He had introduced Howard to Mackey and was with Mackey on the night of the incident. He was with her before she went to Howard's car for the drug transaction. After Mackey exited the car, Howard exited as well. Mackey and Howard exchanged some words, and, the next thing he knew, he hit her and she fell to the ground. Howard told McGee later that he hit Mackey because Mackey "threatened" him.

{¶6} Christopher Poole testified that at the time of the incident, he had just come home from a third shift at work and was walking to his building. He saw Nance, Mackey, McGee, and another individual whom he did not know. Mackey and that

individual were talking, and all of sudden, "she turned facing us and he hit her." Poole was later asked to identify the individual from a photo lineup. Poole could not identify him on the first try, but was able to do so on a second try, with "100%" certainty. It is unclear from his testimony whether the photo lineups were administered on a single or two separate occasions. Detective Joseph Greene, who administered the photo lineups to Poole and was the sole witness presented by the defense, testified that Poole was not able to make an identification. It was unclear, however, from the officer's testimony whether he administered the first or both photo lineups.

{¶7} Nance testified that on the night of the incident, he and his cousin "Pony" were walking down the street. He saw Mackey and a man arguing in a parked car. Mackey got out of the car and started walking, and the man followed her. They stood "in front of each other" talking, and all of a sudden, he hit her, causing her to hit the ground. He identified Howard in court as the man who hit Mackey.

{¶8} Dr. Rothenberg treated Mackey in the emergency room. She described Mackey as "slightly intoxicated." She explained the extent of her jaw injury and the procedure required to hold her jaw in place. In addition, she testified that Mackey suffered mood disorder and PTSD due to abuse in her childhood. Mackey's psychiatric assessment report noted she also suffered "psychotic manifestations," which meant sometimes having "thought processes that could be not in touch with reality."

{¶9} Officer Andrew Ziska investigated the assault incident. He testified that at the scene of the incident, Mackey only identified the individual who struck her as "D."

The following day, Mackey telephoned Officer Ziska and put her friend McGee on the phone. McGee was at first hesitant but finally told the officer the perpetrator's name was "Ledon," who drove a Hyundai Sonata. McGee also provided the officer information regarding where "Ledon" lived. This testimony differed slightly from McGee's own account — McGee himself recalled that he did not talk to the police directly but only gave Mackey information about Ledon's car to give to the police.

{¶10} Detective Tom DeCaro also investigated the incident. He personally prepared three sets of photo lineups, one of them containing Howard's photo. He testified that Mackey identified Howard from one of the three sets of photo lineups. In addition, Mackey provided two phone numbers to the police and Detective DeCaro obtained from the phone company the phone record for one of the numbers. The phone record revealed multiple phone calls between Mackey and Howard on the night of August 15, 2012, and the phone calls stopped at around 2:00 a.m. the next day. Although the account information of the cell phone record, state's exhibit No. 12, includes both Howard's name and the name of another individual "Jim Bell," it was Howard's date of birth and email address that were listed in the account page.

{¶11} Officer Doug Evans was the blind administrator of the photo lineups shown to Mackey. He testified he showed her three sets of photo lineups and she identified Howard from the second set.

{¶12} Kaniece Kates, Howard's fiancée, testified she owned a Hyundai Sonata and she let Howard drive her vehicle. She also testified that sometime in August 2012,

Howard lost his cell phone and obtained a new number, but she did not recall with certainty when, or what these phone numbers were.

**{¶13}** The jury found Howard guilty of felonious assault. The trial court sentenced him to a prison term of three years, to run consecutively to a sentence on an unrelated case.

**{¶14}** Howard now appeals, raising four assignments of error for our review.

### <u>Photo Lineup:    R.C. 2933.83</u>

**{¶15}** Before trial, Howard moved to suppress Mackey's identification of him in the photo lineup.    The trial court denied the motion.    Under the first assignment of error, Howard claims the trial court erred by "failing to give a mandated jury instruction on the state's noncompliance with the statutory requirements of R.C. 2933.83 in violation of appellant's Sixth and Fourteenth Amendment rights."    Under the second assignment of error, Howard claims the trial court erred by "denying the appellant's motion to voir dire witnesses and suppress pretrial identification, in violation of his Sixth and Fourteenth Amendment Rights."    Because the arguments made under these two assignments of error are duplicative, we address them together.

**{¶16}** We begin our review with a background discussion on identification testimony in general.    The courts have adopted a two-prong test for the admissibility of identification testimony.    "An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process."    *State v. Fields*, 8th Dist. Cuyahoga No. 99750,

2014-Ohio-301, ¶ 10, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The burden of demonstrating that the procedures utilized were unnecessarily suggestive is upon the defendant. *State v. Quarterman*, 8th Dist. Cuyahoga No. 99317, 2013-Ohio-4037, ¶ 26.

**{¶17}** "If the defendant meets that burden, the court must consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character." *Fields* at ¶ 10, citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L.Ed.2d 140, 97 S.Ct. 2243 (1977). *See also State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634 (10th Dist.). If, on the other hand, the pretrial procedures were not unnecessarily suggestive, "any remaining questions as to reliability go to the weight of the identification, not its admissibility, and the identification is admissible." *Fields* at ¶ 10, citing *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997). Pretrial identification may be suppressed only if they are both unnecessarily suggestive and unreliable under the totality of the circumstances. *Monford* at ¶ 40. If the defendant fails to meet the first part of his burden, the court need to consider the totality of the circumstances test under the second prong. *State v. Green*, 117 Ohio App.3d 644, 653, 691 N.E.2d 316 (1st Dist.1996).

**{¶18}** R.C. 2933.83, effective July 2010, governs the administration of photo lineups and is aimed at preventing the use of unnecessarily suggestive procedures. *Fields* at ¶ 11. R.C. 2933.83 requires any law enforcement agency that conducts live and photo lineups to adopt specific procedures for conducting the lineups. Such procedures must

provide, at minimum, the use of a "blind" administrator for the photo array. R.C. 2933.83(B). "'Blind administrator' means the administrator does not know the identity of the suspect. 'Blind administrator' includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system." R.C. 2933.83(A)(2).

{¶19} Furthermore, the administrator conducting the lineup must make a written record of the lineup that includes all results obtained during the lineup, the names of all persons at the lineup, the date and time of the lineup, and the sources of the photographs used in the lineup. R.C. 2933.83(B)(4). The administrator is also required to inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know the identity of the suspect. R.C. 2933.83(B)(5).

{¶20} As to the folder system set forth in the statute, it provides for the suspect's photograph, five filler photographs, and four dummy folders. The blind administrator does not know which photo the witness is viewing. R.C. 2933.83(A)(6). Although R.C. 2933.83(A)(6) defines the "folder system" procedure, this court has held that R.C. 2933.83 does not require the use of the "folder system" and that the "folder system" is just one of the systems law enforcement agencies may use for photo lineup identifications. *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 77. *See also* R.C. 2933.83(A)(6) and (D).

{¶21} Finally, the statute provides that evidence of the law enforcement's noncompliance with the statute shall be considered by the trial court in ruling on a

defendant's motion to suppress. R.C. 2933.83(C)(1). Moreover, such evidence of noncompliance is admissible at trial. R.C. 2933.83(C)(2). If such evidence of noncompliance is admitted at trial, the court shall instruct the jury that such noncompliance may be considered in determining the credibility of the witness identification. R.C. 2933.83(C)(3).

## Suppression Hearing

**{¶22}** Having reviewed the statute and the case law regarding photographic identification procedures, we now turn to the instant case. Before trial, Howard filed a "motion to voir dire witness and suppression of eyewitness identification." He did not allege the police administration of the photo lineups was not in compliance with the statute. Rather, he argued Mackey's out-of-court identification was not reliable under the totality of the circumstances pursuant to the second prong of the *Biggers-Monford* test, because she was highly intoxicated at the time of the incident and she only identified her attacker as "D" and her description of that person's build as "thin" did not match his physique. He claimed Mackey identified him based purely on the information provided by McGee, with whom he had a history of animosity.

**{¶23}** At the hearing over the motion to suppress, Detective DeCaro, who prepared the photo lineups, testified that he compiled three sets of photos and gave them to Officer Evans, the blind administrator, to show to Mackey. Officer DeCaro testified Mackey identified folder No. 5 in the second set of lineups, which contained Howard's photo. In the state's exhibit containing the second set of photo lineups, the photos – folders were not

marked with numbers. Detective DeCaro, however, testified that he knew folder No. 5 contained Howard's photo because he compiled the folders himself.[1]

**{¶24}** When the trial court inquired whether the defense was challenging the procedures of the photo array, the defense counsel raised one specific issue regarding the photo lineups. Each set of photo lineups contained a lineup "key," which is a sheet of paper (not available to the blind administrator) containing all six photos in the set with identifying information. Defense counsel pointed out that the photo lineup "key" in the second set of photo lineup (the set containing Howard's photo) should have been marked with number 2, yet it was left unnumbered.

**{¶25}** The defense counsel cross-examined Detective DeCaro at great length regarding the numbering of the lineup "key." Detective DeCaro testified that how the numbering of the lineup "keys" would not affect the identification procedure because the lineup "keys" were not available to the blind administrator during the administration of the photo lineup.

**{¶26}** The state submitted three exhibits, consisting of the three sets of photo lineups prepared by Detective DeCaro and administered by Officer Evans, each complete with the instructions for the administrations, a supplemental report for the folder system

---

[1]We note that the statute provides for a folder system in which the administrator, not the investigating officer, numbers the folders containing the photos. R.C. 2933.83(B)(6)(c). Here, Detective DeCaro testified he numbered the folders, a practice that deviated from the folder system provided in the statute. Howard did not claim any error in this regard, either at trial or on appeal, and we do not find prejudice, as the photo lineups were shown by a blind administrator, who did not know which folder contained the suspect's photo.

utilized, the photos shown, and the lineup "keys." Because the defense did not allege noncompliance with the statute but only focused on the issue of the numbering of the photo lineup "keys," the defense did not question Detective DeCaro regarding the folder system utilized.

{¶27} The trial court found the issue raised by the defense regarding the numbering of the photo lineup "key" to be "minute." It determined the procedure utilized in this case to be in compliance with the statute, meeting the first prong of the test. Because Howard failed to demonstrate the first prong, the court did not address the second prong — whether the identification was reliable under the totality of the circumstances — before it denied the motion to suppress.

{¶28} On appeal, Howard raises a claim regarding the photo lineup not raised before the trial court. He now argues the photo lineup procedure was not in compliance with the statute and was "fatally flawed." He also claims that the trial court erred in not instructing the jury on the "noncompliance" of the procedure utilized, even though he never requested such a jury instruction.

{¶29} Howard waived these claims that he now raises for the first time on appeal. *Phillips v. Irwin*, 96 Ohio St.3d 350, 2002-Ohio-4758, 774 N.E.2d 1218, ¶ 6. Even if we were to consider it, we would find that his claims lack merit, for the following reasons.

{¶30} Howard claims the procedure was not in compliance because the statute required *ten* folders (six containing a photo and four left blank) but Officer Evans testified he showed the victim *three* folders. Our reading of the transcript shows that Howard

grossly misrepresented Officer Evans's testimony. Officer Evans testified he administered three *sets* of photo lineups, each set containing ten folders.

{¶31} Howard also claims the procedure was not in compliance because the state did not offer any evidence of the administrator's "documentation and record" required by R.C. 2933.83(A)(6)(h). This section requires the administrator to document and record the results of the procedure, including (1) the date, time, and location of the lineup procedure, (2) the name of the administrator, (3) the names of all of the individuals present during the lineup, (4) the number of photographs shown to the eyewitness, (5) copies of each photograph shown to the eyewitness, (6) the order in which the folders were presented to the witness, (7) the source of each phonograph, and (8) a statement of the eyewitness's confidence in the eyewitness's own words as to the certainty of the eyewitness's identification.

{¶32} Contrary to Howard's claim, our review of the three sets of photo lineups and accompanying documentation, submitted as exhibits both at the suppression hearing and at trial, reflects that the procedure for the photo lineup administered in this case substantially complied with each of the requirements set forth in 2933.83(A)(6)(h).

{¶33} Therefore, the trial court properly concluded the photo lineup procedure was in compliance with the statute and, as such, it was not unnecessarily suggestive under the first prong of the *Biggers-Monford* analysis. Consequently, the trial court needed not engage in the second prong of the analysis and properly overruled the motion to suppress.

**{¶34}** We additionally observe that, *even if* the administration of the photo lineup to the victim were not in compliance with the statute, any impropriety regarding the photo lineup identification would not have been prejudicial. The victim testified she knew Howard before the incident — she had been purchasing drugs from him and was romantically involved with him. She telephoned him before the incident to purchase drugs and argued with him before she was struck. She also testified that she was "100%" certain the person who struck her was Howard. In addition, several other witnesses also saw Howard strike Mackey.

**{¶35}** Finally, regarding the jury instruction, "the rule regarding jury instructions is that requested instructions in a criminal case must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995). The giving of jury instructions is within the sound discretion of the trial court, and we review it for an abuse of discretion. *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993). Howard is correct that R.C. 2933.83(C)(3) requires the trial court to instruct the jury that noncompliance may be considered in determining the credibility of the witness identification. However, our review of the record indicates the statute was complied with and, therefore, such jury instruction was not warranted in this case.

**{¶36}** The first and second assignments of error are without merit.

### Transcript of Witness's Audiotaped Statement

{¶37} Under the third assignment of error, Howard claims the trial court erred when it denied his motion for a transcript of an audiotaped statement made to the police by McGee, in violation of his Sixth and Fourteenth Amendment rights. Before trial, Howard requested that the state provide a transcript of a videotaped statement made by McGee to the police. Howard claimed that because Mackey was "drunken and high" on the night of the incident and provided insufficient identifying information to the police that night, McGee was *the* key witness in this case. He claimed a written transcript of McGee's statement was necessary in order to effectively cross-examine him and expose any prior inconsistent statements. The defense argued to the trial court that without a written transcript, it would be very cumbersome and time-consuming to cross-examine McGee and to demonstrate inconsistency between his in-court testimony and his statements recorded in the audiotape. The defense argued a transcript of McGee's statements on the audiotape was necessary for purposes of "judicial economy."

{¶38} We first note that, despite claiming McGee made prior inconsistent statements necessitating a careful cross-examination of him aided by a written transcript, the defense *never* did cross-examine McGee at trial regarding his prior recorded statements — presumably because no such inconsistent statements actually existed. Therefore, Howard cannot now claim a denial of a state-provided transcript of the audio-taped statement prejudiced his ability to present a defense.

{¶39} Furthermore, Howard claims he was entitled to a transcript of the audiotaped statement pursuant to the authority of *State v. Arrington*, 42 Ohio St.2d 114, 326 N.E.2d

667 (1975). His reliance is misplaced. In *Arrington*, the court held that in a criminal case, "the state must provide an indigent defendant with a transcript of prior *proceedings* when that transcript is needed for an effective defense or appeal." (Emphasis added.) *Id*. at paragraph one of the syllabus. *Arrington* is not applicable here, because that case concerned the necessity of a state-provided transcript of judicial "proceedings," and we are not aware of any case law interpreting "proceedings" to include a witness's audiotaped police statements. The third assignments of error is without merit.

### Consecutive Sentences

{¶40} Under the fourth assignment of error, Howard argues the trial court erred in failing to make findings required by R.C. 2929.14(C)(4) before imposing the prison term in this case consecutive to an existing sentence in an unrelated case.

{¶41} R.C. 2929.14(C)(4) provides that "[*i*]*f multiple prison terms are imposed on an offender for convictions of multiple offenses*, the court may require the offender to serve the prison terms consecutively" if the court makes findings that "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and one of the factors enumerated in R.C. 2929.14(C)(a)-(c), including the offender's history of criminal conduct.

{¶42} The way the statute is worded — "if multiple prison terms are imposed" — it is unclear whether findings are required when multiple terms are *not* contemporaneously imposed in a single sentencing proceeding. However, the Supreme Court of Ohio had

observed that "Ohio appears to be unique in having a rule that sentences of imprisonment shall be served concurrently." *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891, ¶ 15, citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 66. This court also remarked in *Venes* that "[t]he imposition of consecutive sentences in Ohio is thus an exception to the rule that sentences should be served concurrently. And there is no doubt that the provisions of H.B. 86, like those of S.B. 2 before it, were intended, among other things, to alleviate overcrowding in the prison system." *Venes* at ¶ 15.

{¶43} Indeed, R.C. 2929.41(A) provides expressly that all sentences of imprisonment are presumptively concurrent. It states:

> (A) Except as provided in division (B) of this section, *division (C) of section 2929.14*, or division (D) or (E) of section 2971.03 of the Revised Code, a prison term, jail term, or sentence of imprisonment *shall be served concurrently with any other prison term*, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States. * * *."[2]

(Emphasis added.)

{¶44} Pursuant to R.C. 2929.41(A), therefore, the trial court has the duty to make the statutory findings when imposing consecutive sentences, even when one of the terms had already been imposed in a separate proceeding in an unrelated case. Here, the trial court failed to make the findings required by the statute before imposing consecutive sentences. The state concedes the error. Accordingly, we reverse the trial court's

---

[2]R.C. 2929.41(B) concerns misdemeanor sentencing and R.C. 2971.03 governs sentences for sexually violent offenders.

imposition of consecutive terms of imprisonment and remand the case to the trial court to consider whether consecutive sentences are appropriate and, if so, to enter the proper findings on the record. *State v. LaSalla*, 8th Dist. Cuyahoga No. 99424, 2013-Ohio-4596.

{¶45} This cause is affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

SEAN C. GALLAGHER, P.J., and
KENNETH A. ROCCO, J., CONCUR