[Cite as *State v. Lennon*, 2017-Ohio-2753.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 104344

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DOMINIQUE LENNON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-600096-A

**BEFORE:** Boyle, P.J., Laster Mays, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** May 11, 2017

**ATTORNEY FOR APPELLANT**

Myriam A. Miranda
P.O. Box 40222
Bay Village, Ohio   44140


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Christine M. Vacha
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Dominique Lennon ("Lennon"), appeals his convictions for attempted murder, felonious assault, discharging a firearm on or near a prohibited premise, carrying a concealed weapon, improperly handling a firearm in a vehicle, and vandalism. He raises six assignments of error for our review.

> I. The trial court erred by denying Lennon's motion to exclude pretrial identification testimony in violation of his rights.
>
> II. The trial court erred where the jury was not instructed on the failure to comply with photo lineup procedures in accordance with R.C. 2933.83.
>
> III. The trial court erred by denying Lennon's Crim.R. 29 motions because the convictions were not supported by sufficient evidence.
>
> IV. Lennon's convictions were against the manifest weight of the evidence.
>
> V. Lennon's sentence is contrary to law and the record does not support the imposition of consecutive sentences.
>
> VI. The trial court erred by admitting state's exhibit 90 over Lennon's objection and in violation of Evid.R. 401, 402 and 403.

{¶2} After reviewing the record and pertinent law, we affirm.

## I. Procedural History and Facts

{¶3} In October 2015, a Cuyahoga County Grand Jury indicted Lennon on ten counts: attempted murder of the first victim, D.D., in violation of R.C. 2923.02 and 2903.02(A), a first-degree felony, with one- and three-year firearm specifications; two counts of felonious assault against D.D. in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), second-degree felonies, with one- and three-year firearm specifications; attempted murder of the second victim, Quantez Lawson ("Lawson"), in violation of R.C.

2923.02 and 2903.02(A), a first-degree felony, with one- and three-year firearm specifications; two counts of felonious assault against Lawson in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), second-degree felonies, with one- and three-year firearm specifications; discharge of a firearm on or near a prohibited premise in violation of R.C. 2923.162(A)(3), a first-degree felony, with one- and three-year firearm specifications; carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a fourth-degree felony; improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), a fourth-degree felony; and vandalism in violation of R.C. 2909.05(B)(1)(b), a fifth-degree felony.

{¶4} The charges giving rise to the indictment alleged that on August 21, 2015, in the area of East 116th Street and Buckeye Avenue, in Cleveland, Ohio, Lennon brandished a handgun and fired numerous rounds toward a group of people known as the "Buckeye Boys." The first victim, D.D., was a 13-year-old boy who was shot in the right hand. The second victim, Lawson, was struck in the leg and buttocks. Huntington Bank, a business nearby, also sustained damage as a result of the gunshots. Lennon pleaded not guilty to all charges.

{¶5} Before trial, Lennon moved to suppress D.D.'s pretrial identification testimony. At a hearing before trial, Lennon's counsel withdrew the motion. At this hearing, plaintiff-appellee, state of Ohio, informed the trial court and Lennon's counsel that an eyewitness had recently come forward. The eyewitness, T.H., was the

16-year-old sister of D.D. Lennon's counsel orally moved to suppress T.H.'s identification.

## A. The Suppression Hearing

{¶6} The trial court held a hearing on Lennon's motion to suppress where the following testimony was presented.

{¶7} T.H. testified that in March 2015, she first heard of a person named "Boom" because two of her friends were in a car accident with him.[1] At this time, she also learned that Boone's first name was Dominique. In June or July 2015, T.H. saw the Buckeye Boys "beat[ing] up" Boone at the liquor store located at East 116th Street and Buckeye Avenue — the same area where the shootings in this case occurred. This was the first time T.H. saw Boone and "put a face with the name." T.H. never actually met Boone.

{¶8} On August 21, 2015, the day D.D. and Lawson were shot, T.H. was walking behind D.D. as he walked to the liquor store to buy food. She saw two cars, a "silver four door van and a white car," drive into a parking lot. She saw someone exit the silver van, go by a tree, and shoot towards Joe-Joe — Lawson's "street name." T.H. testified that the shooter wore a black jogging suit.

{¶9} Once the shooting began, T.H. ran to her house. From there, she saw the shooter return to the vehicle and "saw his face when he got back into the car." She

---

[1] Witnesses used the "street name" of "Boom" or "Boone" for Lennon. Detective Michael Shay ("Detective Shay") and Officer Shane Bauhof ("Officer Bauhof") testified, however, that Lennon's street name is "Boone." As such, we will use "Boone" for the remainder of this opinion.

testified the shooter was Boone — the same person she saw the Buckeye Boys previously fighting with at the liquor store.

{¶10} T.H. testified that the day after the shootings Boone "came back shooting at the Buckeye Boys." T.H. testified that Boone was alone and driving a brown truck. At that time, Boone looked T.H. in the eyes and she knew he was the "guy from the day before."

{¶11} T.H. testified, however, that she did not see how D.D. was shot. She was not sure if there was anyone other than Boone shooting a gun, although she heard two guns. She testified that "there was some other boy with a gun," but she did not know his name.

{¶12} T.H. failed to tell police what she witnessed until the week of Lennon's trial. She testified that she did not tell police because "at first I didn't want to speak. Because my mom said don't speak if I'm not spoken to."

{¶13} When she came forward, she gave a statement to Detective Daugenti. She told him that she was familiar with Boone. T.H. testified that the detective showed her a single photograph and stated: "I am going to show you a photo of Dominique Lennon, is that who you know as Boo[ne]?" T.H. answered, "Yes." T.H. also testified that the detective showed her a sheet with six photographs of young African American men and asked her to choose the person who shot D.D. T.H. said that the detective did not tell her who to pick and did not tell her that the shooter may or may not be in the photographs. T.H. testified she picked Boone's photograph immediately because of his dreadlocks.

**{¶14}** T.H. made an in-court identification of Boone as Lennon and said that Lennon was the shooter.

**{¶15}** Detective Shay testified that he was the lead investigator for Lennon's case until January 2016, when he left for a position in basic patrol. He testified that Detective Daugenti took T.H.'s statement, but that he was present during the end of it. Detective Shay testified that he had compiled a six-photo lineup during the course of his investigation, but he disagreed with T.H. that she was shown the lineup. He made it clear that she was not shown the lineup because she knew Lennon. Therefore, Detective Daugenti only showed T.H. one photograph of Lennon, which was from the Ohio Law Enforcement Gateway system.

**{¶16}** Detective Shay testified that it is the Cleveland Police Department's written procedure that when a victim or witness does not know the suspect, a photo lineup must be used. When a victim or witness knows the suspect, a photo lineup is not necessary.

**{¶17}** After hearing T.H.'s and Detective Shay's testimony, the trial court denied Lennon's motion to suppress. The trial court noted that under R.C. 2933.83, which sets forth eyewitness identification procedures in lineups, it had to consider whether police failed to comply with the statute. The trial court stated, "I don't think this is a complete stranger scenario, which would at least, in my opinion, require a complete compliance or substantial compliance with 2933.83. But [T.H.] knew who he was." The trial court found:

> [T.H.'s] testimony, and her in-court identification, as well, was certainly that of a level of certainty. And that goes along with her testimony of

having met this guy previously or knew who he was prior. It's not to say I wouldn't entertain particular requests for jury instructions at a later point. But at this point in time she'll be able to testify on the identification[.] So I'm going to deny your motion.

**B. Jury Trial**

{¶18} The matter proceeded to a jury trial and the following evidence was presented.

{¶19} D.D.'s mother, Tamika Palmer ("Palmer"), testified that D.D. is dyslexic and developmentally delayed. On the day of the shootings, she gave D.D. money to walk to the liquor store to buy food. D.D. was with another young boy. Palmer's house is not far from the area where the shootings occurred. Soon after D.D. left, Palmer heard gunshots. She went outside and saw her daughter, T.H., by the liquor store. She then learned that her son had been shot and ran to help him.

{¶20} The day after the shootings, Palmer was with D.D. when Detective Shay came to her home. She witnessed D.D. identify a man named Boone as the shooter.

{¶21} The next day she was again with D.D. when Detective Shay showed D.D. a photo lineup with six color photographs. She witnessed D.D. pick Lennon's photograph from the photo lineup. She made certain that her son was sure and told him that if he was not sure, then he should not pick anyone. She signed the photo lineup for D.D. because he could not write due to his hand being shot.

{¶22} D.D. testified that on the day of the shootings, he and his friend walked to the liquor store after he received money from his mother. He heard a gunshot, looked back, saw someone with a black "hoodie," and heard more gunshots. D.D. testified he

saw a "little bit" of the shooter's face. He then started running, not realizing that he had been shot in the hand.

{¶23} D.D. recalled giving Detective Shay the name Boone, looking at a group of photographs, and choosing the person who he believed shot him. He testified that no one told him he had to identify anyone. He chose Lennon because he saw part of the shooter's face at the time of the shooting and recognized his skin color and dreadlocks.

{¶24} D.D. testified that when he chose Lennon from the photo lineup, he was about 30 percent certain, and on the witness stand he said that he was 40 percent certain of his identification. When asked at trial if he knew who shot him, D.D. testified, "yes," and identified Lennon as the shooter. Then, D.D. stated that he was "not sure" who shot him. D.D. admitted that he was scared because Lennon knew where he lived.

{¶25} T.H.'s trial testimony was similar to her testimony at the suppression hearing. She testified that the shooter wore a black jogging suit, which she explained meant sweat pants and a "hoodie." T.H. testified that she knew the shooter was Lennon "[b]ecause his dreads were sticking out, and I saw his face. He didn't have nothing on his face." She came forward at trial because D.D. was scared to testify. She made an in-court identification of Lennon as the shooter.

{¶26} Lawson[2] testified that he has known Lennon for about two or two and one-half years. Lennon used to "chill" with the Buckeye Boys until he allegedly stole

---

[2] Lawson was not cooperative with the investigation and was jailed so that he would appear at the trial to testify.

money from one of them. Lawson said that the Buckeye Boys physically fought with Lennon approximately two or three weeks before the shootings.

{¶27} Days after the shootings, Lawson told police that the shooter was wearing all black with a "hoodie." At trial, however, Lawson claimed that he told this to police because he "had just got out of surgery and they was waking me up out of my sleep," so he made up the description. Lawson then testified that he did not know who shot him, but stated that he had seen Lennon with a gun in the past. Lawson also testified that Lennon sent him a letter after the shootings, which he gave to police. In the letter, Lennon discussed his theory about the shootings, including who shot D.D. and Lawson; Lennon said it was "Joe" a cousin of Lawson's friend "Munchy."

{¶28} An employee of Huntington Bank testified about the bullet holes and damage to the bank because of the shootings.

{¶29} Officer Paul Benedictis ("Officer Benedictis") testified that on the day of the shootings, he went to the hospital to check on D.D. At that time, D.D. gave a description of the suspect and Officer Benedictis made a broadcast accordingly: the suspect was a black male, around 20 years old, wearing black, possible dreads, about 5'10", 160 pounds, and had black hair.

{¶30} Officer Bauhof testified about his extensive knowledge of the area where the shootings occurred. He knew that Lawson, the Buckeye Boys, and Lennon frequented the area. He testified that Detective Shay contacted him after the shootings to ask if he knew someone with a "street name" of Boone. Officer Bauhof confirmed

that he gave Lennon's name to Detective Shay. He also testified that Lennon was known to carry a gun.

{¶31} A forensic scientist testified that Lawson tested positive for gunshot residue.

{¶32} Yolanda Rivers testified that she owned the home closest to where the shootings occurred. She was home when the shootings occurred. She said that it was light outside, and when she heard the gunshots she went to her kitchen window. At that time, she saw an African American male with dreadlocks in a black shirt and black pants who was behind a tree. She then saw the male run and enter a gray truck that drove away. She did not see a gun and did not see the shootings.

{¶33} Sabrina Lindsey was at her sister Yolanda Rivers's house at the time of the shootings. She heard "a whole bunch of shooting going on" and she called 911. She testified that she saw an African American male with a gun who jumped in the back seat of a Ford Escape. The 911 recording confirmed that Lindsey "believed [the shooter] had on some blue jeans," but "that it just happened so fast."

{¶34} Detective Todd Marazzi, a firearms examiner, testified that there were two guns involved in the incident. One gun fired nine shots, while the other fired five shots.

{¶35} Detective Shay, the lead investigator, testified that on the day after the shootings, he met with D.D. at his home. At that time, D.D. gave a description of the suspect as a black male, about 20 years old, with dreadlocks, wearing all black with a

"hoodie," 5'8" to 5'10", and had a medium to slim build. It was also at this time that D.D. identified the shooter as Boone.

{¶36} Detective Shay testified that after D.D. gave him the shooter's name, he contacted Officer Bauhof who conveyed that Boone was Lennon. Detective Shay then obtained Lennon's photograph and constructed a photo lineup using the Ohio Attorney General's photo lineup Wizard program. Detective Shay stated that the color photo lineup contained a photograph of Lennon and five fillers of individuals.

{¶37} Two days after the shootings, Detective Shay went to D.D.'s house to show him the photo lineup. He testified that he was not a blind administrator, but that there was no blind administrator available because it was a Sunday and there were no other detectives in the office. Detective Shay testified that he documented that there was "no blind administrator available." He testified that he thought it was imminent to try to obtain an identification "[b]ecause it was becoming apparent that cooperation was going to be sketchy, at best."

{¶38} Detective Shay showed D.D. the photo lineup and told D.D. that the suspect may or may not be in the lineup. He testified that he did not steer D.D. to make any identification. D.D. reviewed the photo lineup and picked photograph number five, which was Lennon. Detective Shay testified that D.D.'s mom signed his name to the photo lineup. Detective Shay then wrote "95 percent" next to the line for photograph number five. Detective Shay stated that 95 percent was the "degree of confidence"

relayed by D.D. at the time of the identification. Detective Shay made sure that D.D. understood what "degree of confidence" meant.

{¶39} With respect to T.H. and her statement obtained before trial, Detective Shay testified as he did during the suppression hearing.

### C. Verdict and Sentence

{¶40} After hearing the testimony and considering the evidence, the jury found Lennon guilty on all counts. After the verdict, the trial court proceeded to sentencing.

{¶41} For purposes of sentencing, the trial court merged the attempted murder and two felonious assault convictions with respect to each victim (Counts 1, 2, and 3 merged for D.D., and Counts 4, 5, and 6 merged for Lawson). The trial court further merged the respective one- and three-year firearm specifications attached to each attempted murder conviction (leaving a three-year specification on each), and also merged the offense of discharging a firearm at or near prohibited premises (Count 7) with the remaining attempted murder convictions (Counts 1 and 4). The state elected to proceed on the attempted murder convictions.

{¶42} For each attempted murder conviction, the trial court sentenced Lennon to three years in prison for the firearm specifications, to be served prior to and consecutive to seven years in prison on the underlying base charge of attempted murder, for a total of ten years in prison on each count. The trial court then ordered Lennon's ten-year prison sentence for each attempted murder conviction be served consecutive to one another.

**{¶43}** The trial court further sentenced Lennon to 12 months in prison for carrying a concealed weapon (Count 8), 12 months for improperly handling a firearm in a motor vehicle (Count 9), and 12 months for vandalism (Count 10), all to be served concurrent to each other, but consecutive to Lennon's prison sentence for the attempted murders, for an aggregate sentence of 21 years in prison.

## II. Suppression of Pretrial Identification

**{¶44}** In his first assignment of error, Lennon argues that the trial court erred in denying his motion to suppress T.H.'s and D.D.'s identification of him because the detectives failed to comply with the requirements of R.C. 2933.83. Specifically, Lennon claims that police did not use a blind administrator, that the procedures were impermissibly suggestive, and, as a result, the testimony was unreliable.

**{¶45}** A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Thus, we give deference to the trial judge's factual findings, but we review the application of law to the facts de novo. *Id.*; *see also State v. Davis*, 8th Dist. Cuyahoga No. 83033, 2004-Ohio-1908.

**{¶46}** R.C. 2933.83 governs the administration of photo lineups and is aimed at preventing the use of unnecessarily suggestive procedures. *State v. Fields*, 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, ¶ 11. R.C. 2933.83(A)(8) defines a photo lineup as "an identification procedure in which an array of photographs * * * is displayed to an eyewitness[.]"

**{¶47}** R.C. 2933.83 requires any law enforcement agency that conducts photo lineups to adopt specific procedures for conducting the lineups, including the use of a blind administrator to conduct a photo lineup. R.C. 2933.83(B). If, however, it is impracticable for a blind administrator to conduct the lineup, then the administrator must state in writing the reason for that impracticability. R.C. 2933.83(B)(2).

**{¶48}** Under R.C. 2933.83(C)(1), a trial court must consider evidence of a failure to comply with the required lineup procedures in adjudicating motions to suppress eyewitness identifications. R.C. 2933.83(C)(1), however, does not provide an independent basis to suppress evidence, and a trial court errs in solely relying on the statute in suppressing an identification. The overriding analysis remains whether the procedure was "impermissibly suggestive." *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 84, citing *State v. Henry*, 6th Dist. Lucas No. L-11-1157, 2012-Ohio-5552 (failure to strictly comply with blind administrator component does not necessarily result in reversible error).

**{¶49}** Regarding the admissibility of identification testimony in general, courts have adopted a two-prong test. First, the trial court must determine whether the identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Second, the trial court must determine whether the identification itself was unreliable under the totality of the circumstances. *See Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The defendant has the burden of demonstrating that the procedures used were unnecessarily suggestive. *Id.*

**{¶50}** If the defendant fails to meet the first part of his or her burden, the court need not consider the totality of the circumstances under the second prong. *State v. Tate*, 8th Dist. Cuyahoga No. 103446, 2016-Ohio-5622, ¶ 31, citing *State v. Green*, 117 Ohio App.3d 644, 691 N.E.2d 316 (1st Dist.1996). If the pretrial procedures were not suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility. *Id.*

**{¶51}** If, on the other hand, the defendant establishes that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable. To determine reliability, the United States Supreme Court instructs courts to consider the following factors: the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Biggers* at 199-200.

### A. T.H.'s Pretrial Identification

**{¶52}** Lennon argues that the detective failed to comply with R.C. 2933.83 when he showed T.H. only one photograph of Lennon. Lennon claims that this procedure was impermissibly suggestive. Lennon further argues that T.H.'s identification was unreliable because she failed to come forward until the week of trial.

**{¶53}** First, we find that neither a live lineup nor a photo lineup occurred in this case and, therefore, R.C. 2933.83 does not apply to the issue of suppressing T.H.'s

identification. *State v. Miller*, 11th Dist. Lake No. 2011-L-111, 2012-Ohio-3515, ¶ 37. Detective Shay testified that T.H. was shown only a single photograph of Lennon because it was clear that T.H. knew him. Although T.H. testified that she was shown a group of photographs, there was no other testimony or evidence to corroborate this — a fact that Lennon admitted at trial and admits here.

{¶54} Therefore, we must consider whether Lennon's due process rights were violated as a result of the procedure for T.H.'s identification. Generally, the showing of a single suspect, one who is not part of a lineup, for identification purposes, is discouraged. *State v. Smith*, 8th Dist. Cuyahoga No. 94545, 2011-Ohio-924, ¶ 18. This court, however, has found that the showing of a single photograph is not impermissibly suggestive when the witness knew the suspect and identified him by his nickname prior to seeing the photograph. *State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2017-Ohio-529, ¶ 29; *see also State v. Huff*, 145 Ohio App.3d 555, 763 N.E.2d 695 (1st Dist.2001) (a strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed).

{¶55} During the suppression hearing, T.H. testified that she first heard of Lennon in March 2015 and then personally saw him during the summer of 2015 when the Buckeye Boys beat him up.

{¶56} On the day of the shootings, T.H. testified that she saw Lennon's face and that she "saw him with my own eyes." She testified about the clothing he wore and the fact that he had dreadlocks. She also testified that the day following the shootings,

Lennon returned looking for the Buckeye Boys and she recognized him as the shooter from the previous day.

{¶57} When T.H. came forward months later, she informed the detective about her knowledge of Lennon, particularly her knowledge of his "street name" Boone. As a result, the detective showed her a single color photograph of Lennon. The detective said to T.H., "I am going to show you a photo of Dominique Lennon — is that who you know as Boo[ne]?" She replied, "Yes."

{¶58} Detective Shay testified that pursuant to Cleveland Police Department procedures, officers should use a photo lineup when a witness does *not* know the suspect. Because T.H. knew Lennon, Detective Daugenti showed her a single photograph.

{¶59} Considering the totality of the circumstances, we cannot say that the procedure for T.H.'s identification was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification or that her identification was unreliable. T.H. told Detective Daugenti that she knew Boone. Therefore, Detective Daugenti showed T.H. a single photograph to confirm whether the person she knew as Boone was Lennon.

{¶60} Further, T.H. was present when the shootings occurred; she had the opportunity to view the shooter at the time of the offense; as the trial court stated, T.H.'s demeanor, body language and level of certainty suggests the degree of attention and accuracy in her identification. We are mindful that T.H. failed to come forward until the week of trial, but that one factor does not warrant suppression of her identification.

**{¶61}** After review, we conclude that any challenge to T.H.'s identification of Lennon goes to the weight of the evidence, not to its admissibility.

**{¶62}** Lennon's first assignment of error is without merit and is overruled. **B.**

### D.D.'s Pretrial Identification

**{¶63}** Lennon argues that the detective failed to comply with R.C. 2933.83 because he showed the photo lineup to D.D. without using a blind administrator. Lennon further argues that the trial court should have suppressed D.D.'s identification because D.D. testified at trial that he was only 30 percent sure of his photo lineup identification and only 40 percent sure of his in-court identification.

**{¶64}** Prior to trial, Lennon's defense counsel filed a motion to suppress the pretrial identification of D.D. During a hearing, however, Lennon's defense counsel orally withdrew this motion. He never renewed the motion and, in fact, when D.D. testified at trial, Lennon did not object to D.D.'s photo lineup identification testimony. Rather, Lennon's counsel cross-examined D.D. on the procedures used by the detective and the certainty of D.D. in his identification. Because Lennon's counsel withdrew the motion to suppress as it relates to D.D.'s identification, he waived all but plain error as to the issue. *State v. Quarterman*, 8th Dist. Cuyahoga No. 99317, 2013-Ohio-4037, ¶ 24 (failure to file motion to suppress and failure to make objection to admissibility of photo array constituted a waiver of all but plain error on appeal).

**{¶65}** Plain error applies only under exceptional circumstances to prevent a manifest miscarriage of justice. *Id.* at ¶ 25. Plain error does not exist unless it can be

said that but for the error, the outcome of the trial would have clearly been otherwise. *Id.,* citing *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990).

**{¶66}** After review, we do not find plain error in this case. R.C. 2933.83(B)(1) provides that a blind administrator must be used for a photo lineup unless impracticable. In the event it is impracticable to use a blind administrator, then the reason for the impracticability must be documented. R.C. 2933.83(B)(2). Here, Detective Shay admitted that he was not a blind administrator when he showed D.D. the photo lineup. Detective Shay testified, however, that he did not use a blind administrator because there was "no blind administrator available" — a fact that he documented. Therefore, Detective Shay complied with R.C. 2933.83.

**{¶67}** We note that the failure to use a blind administrator does not, by itself, require suppression of D.D.'s testimony. *See State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395 (failure to use blind administrators, as required by the statute, does not, by itself, require suppression of the evidence); *see also Henry*, 6th Dist. Lucas No. L-11-1157, 2012-Ohio-5552. The issue is whether the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Moon* at ¶ 29-30.

**{¶68}** We find that Lennon failed to meet his burden of proving that the identification procedure was impermissibly suggestive. The evidence establishes that Detective Shay showed D.D. the photo lineup two days after the shooting and a day after D.D. identified Boone as the shooter. Detective Shay testified that he discussed the

"degree of confidence" with D.D. After being told that the suspect may or may not be in the photo lineup, D.D. chose the photograph of Lennon. At the time, D.D. stated he was 95 percent certain the person he chose was the shooter.

{¶69} Lennon's argument regarding the contradiction in D.D.'s level of certainty before trial and at trial goes to the weight of D.D.'s identification and not to its admissibility.

{¶70} We find no plain error in the trial court's admittance of D.D.'s identification testimony.

{¶71} Accordingly, Lennon's first assignment of error is overruled.

## III. Jury Instruction

{¶72} In his second assignment of error, Lennon argues that the trial court erred in failing to give a jury instruction pursuant to R.C. 2933.83(C)(3) because the detectives failed to use a blind administrator when they obtained T.H.'s and D.D.'s identifications. At trial, Lennon requested the jury instruction and objected to the trial court's decision denying his request.

{¶73} When evidence of failing to comply with R.C. 2933.83(C)(3) is presented at trial, the trial court shall instruct the jury that it "may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup." R.C. 2933.83(C)(3).

{¶74} Because we found that R.C. 2933.83 does not apply to T.H.'s identification, Lennon's argument with respect to her identification is without merit.

**{¶75}** With respect to D.D.'s identification, we found that law enforcement complied with R.C. 2933.83 because a blind administrator was not available and Detective Shay documented that fact as required. Therefore, a jury instruction was not required pursuant to R.C. 2933.83(C)(3).[3] *See State v. Howard,* 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176 (even when the procedure for the lineup only substantially complied with requirements of R.C. 2933.83(A)(6)(h), no jury instruction was warranted).

**{¶76}** Moreover, the trial court gave a significant jury instruction on the credibility of witnesses and eyewitness identification. The trial court instructed the jury that "some things you may consider in weighing the testimony of identifying witnesses are," among other things, "all surrounding circumstances under which [the] witness has identified the defendant, including deficiencies, if any, in line-up, photo display or one-on-one" procedures. Accordingly, the jury was instructed that the identification procedures could be considered in determining the reliability of the witnesses. *See State v. Woods*, 1st Dist. Hamilton Nos. C-130413 and C-130414, 2014-Ohio-3892 (even though the court did not identify the identification statute by its Revised Code section, the jury was properly instructed that the procedures used by the officers could be considered in determining the reliability of the identification).

---

[3]In support of this assignment of error, Lennon asserts that the "trial court acknowledged that law enforcement had not complied with the procedures." Lennon cites to page 385 of the trial transcript. Lennon is mistaken because nothing contained on page 385, or anywhere in the transcript, supports his theory that the trial court acknowledged any noncompliance by law enforcement.

**{¶77}** We find no merit to Lennon's argument and, therefore, his second assignment of error is overruled.

## IV. Crim.R. 29 Motion

**{¶78}** Lennon claims in his third assignment of error that the trial court erred by denying his Crim.R. 29 motion because the state failed to present sufficient evidence for the convictions. Lennon argues that the pretrial identifications were tainted and should have been excluded. He also argues that the remaining witnesses and evidence "failed to tie [Lennon] to the crime scene."

**{¶79}** When reviewing the denial of a Crim.R. 29 motion, an appellate court applies the same standard as is used to review a sufficiency of the evidence claim. *State v. Sheppeard*, 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 51. "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1422 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶80}** In this case, the jury heard testimony from Officer Benedictis who spoke with the victim, D.D., on the evening of the shootings. D.D. gave the following

description of the shooter: black male, around 20 years old, wearing black, possible dreads, about 5'10", 160 pounds, black hair. Lennon matched this description.

{¶81} A day after the shootings, D.D. gave Detective Shay virtually the same description of the shooter. He also identified Boone as the shooter. Detective Shay investigated the street name Boone and learned that it was Lennon.

{¶82} Two days after the shootings, Detective Shay met with D.D. and showed him a photo lineup. Detective Shay told D.D. that the shooter may or may not be in the photographs. D.D. reviewed the photo lineup and chose Lennon as the shooter. D.D. indicated that he was 95 percent certain that the person he chose, Lennon, was the shooter.

{¶83} The jury also heard from T.H. who testified that she had heard of Boone and had seen him prior to the shootings. T.H. testified that on the day of the shootings she saw the shooter's face and knew it was Lennon. She testified that the shooter had nothing on his face and that she recognized Lennon because his dreadlocks were sticking out of his black "hoodie." She also testified that the day after the shootings Lennon returned looking for the Buckeye Boys. Lennon looked T.H. in the eyes and she knew he was the shooter from the previous day.

{¶84} T.H.'s or D.D.'s testimony alone, if believed, would have been sufficient evidence for a jury to find that Lennon was the shooter beyond a reasonable doubt.

{¶85} We have already ruled on Lennon's arguments regarding the pretrial identifications and need not reiterate our conclusions here. We find that, after reviewing

all of the evidence in a light most favorable to the state, a rational trier of fact could have found that Lennon was the shooter beyond a reasonable doubt. Thus, the state presented sufficient evidence, and the trial court did not err when it denied Lennon's Crim.R. 29 motion.

{¶86} Lennon's third assignment of error is overruled.

## V. Manifest Weight of the Evidence

{¶87} In his fourth assignment of error, Lennon argues that his convictions were against the manifest weight of the evidence because (1) the victim and eyewitness identifications were uncertain, inconsistent, and not credible, and (2) law enforcement failed to follow proper procedures in obtaining evidence and identifications.

{¶88} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *See Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*

{¶89} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at ¶ 387, quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶90} As discussed above, Lennon failed to meet his burden to establish that the identification procedures were improper or unduly suggestive. Lennon claims, however, that the eyewitness identifications were uncertain, inconsistent, and unreliable.

{¶91} We recognize that the victim D.D. testified at trial that he was only 30 percent certain at the time of his pretrial identification and 40 percent certain of his identification while testifying at trial. This, however, ignores the fact that on the night of the shootings D.D. gave a description of the shooter that matched Lennon. Further, the day after the shootings, D.D. told Detective Shay that Boone was the shooter. Finally, two days after the shooting, Detective Shay showed D.D. a photo lineup, told him the shooter may or may not be in the photographs, and D.D. chose Lennon's photograph. The detective testified that at that time, D.D. was 95 percent certain that Lennon was the shooter. The jury was free to believe the detective's testimony over D.D.'s testimony at trial — especially considering that the jury also heard that D.D. was scared to testify because Lennon knew where he and his family lived.

{¶92} And although T.H. failed to come forward until the week of trial, she testified that she knew of Lennon and had seen him prior to the shootings. Then, on the day of the shootings, she saw the shooter's face and recognized him as Lennon.

{¶93} As this court has stated, "even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 52, citing *State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934.

{¶94} The weight of the evidence and the credibility of witnesses are primarily for the trier of fact, and a reviewing court must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt. *Johnson* at ¶ 53, citing *State v. Chavez*, 8th Dist. Cuyahoga No. 99436, 2013-Ohio-4700. Further, because the factfinder has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires substantial deference be extended to the factfinder's determinations of credibility. *Johnson* at ¶ 54, citing *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375. Thus, the decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder who has seen and heard the witness.

{¶95} Here, the jury had the opportunity to see and hear the witnesses. We find that this is not the exceptional case in which the evidence weighs heavily against the convictions. Keeping in mind that we must act as a "thirteenth juror," we cannot say

that the jury in this case clearly lost its way and created such a miscarriage of justice that the convictions are against the manifest weight of the evidence.

{¶96} Accordingly, we overrule Lennon's fourth assignment of error.

## VI. Consecutive Sentences

{¶97} In his fifth assignment of error, Lennon argues that his sentence is contrary to law because the record does not support consecutive sentences.

{¶98} We review felony sentences under the standard set forth in R.C. 2953.08 (G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 16. R.C. 2953.08(G)(2) provides that a reviewing court may overturn the imposition of consecutive sentences where the court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings" under R.C. 2929.14(C)(4), or (2) "the sentence is otherwise contrary to law." *Id.*

{¶99} R.C. 2929.14(C)(4) provides that in order to impose consecutive sentences, the trial court must find that consecutive sentences are (1) necessary to protect the public from future crime or to punish the offender, (2) that such sentences would not be disproportionate to the seriousness of the conduct and to the danger the offender poses to the public, and (3) that one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense;

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct   adequately reflects the seriousness of the offender's conduct;

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

**{¶100}** In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings.  *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 33.   "Nor is [the trial court] required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry."  *Id.*

**{¶101}** At the sentencing hearing in this case, the trial court recited Lennon's criminal history, including the fact that he committed the shootings while he was on probation for two other criminal cases. The trial court found Lennon's behavior to be a clear course of conduct dealing with weapons.   The trial court also indicated that this case was one of the most troubling it had seen because of the violence involved, the fact that two people were injured, and property was damaged, especially given Lennon's criminal history.   The trial court stated that consecutive sentences were necessary to protect the public and to punish Lennon.   The trial court further discussed the harm

caused to two people and Lennon's history of dealing with guns, thereby considering consecutive sentences to be proportionate to the severity of Lennon's conduct. The trial court memorialized its findings in the journal entry dated March 2016.

{¶102} The record in this case supports the imposition of consecutive sentences. There can be no doubt that two people, including one juvenile, were significantly injured as a result of the shootings by Lennon. Moreover, Lennon committed the shootings in this case while he was on probation for two other criminal cases. Further, as the trial court correctly noted, Lennon's criminal history involves a pattern of violence with guns. Therefore, consecutive sentences were supported by the record.

{¶103} Accordingly, we overrule Lennon's fifth assignment of error.

## VII. Inadmissible Evidence

{¶104} In his sixth assignment of error, Lennon argues that the trial court erred in admitting Lennon's letter to Lawson over objection and in violation of Evid.R. 401, 402, and 403. Specifically, Lennon argues that the letter has no relevance and that the jailhouse references are prejudicial to him.

{¶105} Evidence that is admitted over objection at trial is subject to an abuse of discretion standard. A trial court has broad discretion in determining whether to admit or exclude evidence. *Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, at ¶ 103, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810. Absent an abuse of discretion and a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of

relevant evidence. *Id.* An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Id.*

**{¶106}** "All relevant evidence is admissible except as otherwise provided by [federal and state law]." Evid.R. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Nevertheless, even relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Evid.R. 403(A). Further, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

**{¶107}** Lennon argues that the trial court erred when it allowed the state to introduce the letter because he wrote and sent it to Lawson while he was in the Cuyahoga County Jail. The evidence established that Lennon wrote the letter after the shootings and sent it to Lawson, who gave it to the state. Although Lennon objected to the letter's admissibility at trial, his defense counsel referenced the letter in closing argument. Specifically, Lennon's defense counsel argued that the letter supported Lennon's innocence because he proclaimed so to Lawson in the letter.

**{¶108}** We find no error in the admission of the letter at trial. As the trial court noted, the letter was voluntarily given by the victim to the state and it was Lennon's own statement. Likewise, the state redacted portions of the letter that would give any

indication to the jury that it was written from jail. The trial court did not abuse its discretion in allowing the letter to be presented to the jury.

{¶109} Lennon's sixth assignment of error is overruled.

{¶110} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR