[Cite as *State v. Riley*, 2019-Ohio-981.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 107073

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**MICHAEL RILEY**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-608045-A

**BEFORE:** Blackmon, P.J., Laster Mays, J., and Headen, J.

**RELEASED AND JOURNALIZED:** March 21, 2019

**ATTORNEY FOR APPELLANT**

Robert A. Dixon
4403 St. Clair Ave.
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Daniel T. Van
Kelly N. Mason
Blaise D. Thomas
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


PATRICIA ANN BLACKMON, P.J.:

{**¶1**}    Michael Riley ("Riley") appeals his convictions for murder, attempted murder,

and various associated offenses and assigns the following errors for our review:

> I.    The verdicts and judgment below were not supported by the manifest weight of the evidence.
>
> II.   The verdicts and judgment below are not supported by legally sufficient evidence in violation of the appellant's due process rights.
>
> III.  The lower court erred and denied the appellant a fair trial when it denied the defense motion to strike the eyewitness identification testimony of Toni Valenti.

{**¶2**}    Having reviewed the record and pertinent law, we affirm the decision of the trial

court.   The apposite facts follow.

{¶3} On June 5, 2016, at just before 2:30 a.m., Juan Mitchell and Tarez Steele were shot as they exited the Iron City Café on W. 14th Street and Jennings Avenue in Cleveland. Mitchell died on the scene, and Steele required surgery to repair damage the bullet caused to his foot. According to witnesses and video footage from surveillance cameras, the gunfire came from the driver's side rear window of a Nissan Altima that was pulling out of the bar's parking lot.

{¶4} On July 20, 2016, Riley was charged with aggravated murder, murder, attempted murder, four counts of felonious assault, discharge of a firearm on or near prohibited premises, improperly handling firearms in a motor vehicle, and having a weapon while under disability. Riley was also charged with one-, three-, and five-year firearm specifications. Riley's case was tried to the bench, and on March 20, 2018, the court acquitted Riley of aggravated murder and found him guilty on all other counts and specifications. On March 28, 2018, the court sentenced Riley to 15 years to life in prison for the murder, consecutive to 11 years in prison for the firearm specifications. The court ordered the remainder of Riley's sentence to be served concurrent to this 26-year-to-life prison term. It is from these convictions that Riley appeals.

## The Convictions

{¶5} Riley was convicted of the following offenses:

{¶6} Murder in violation of R.C. 2903.02(B), which states that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

{¶7} Felonious assault in violation of R.C. 2903.11(A)(1) and (2), which state that "[n]o person shall knowingly * * * [c]ause serious physical harm to another [or] [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."

{¶8} Attempted murder in violation of R.C. 2903.02(A) and 2923.02, which state that "[n]o person shall purposely cause the death of another" and "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶9} Discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), which states that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway."

{¶10} Improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), which states that "[n]o person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle."

{¶11} Having a weapon while under disability in violation of R.C. 2923.13(A)(3), which states that "no person shall knowingly acquire, have, carry, or use any firearm * * * if * * * [t]he person * * * has been convicted of any felony offense involving" illegal drugs.

{¶12} One-, three-, and five-year firearm specifications in violation of R.C. 2941.141, 2941.145, and 2941.146, respectively, which state as follows: "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense"; that the offender "displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense"; and "purposely or knowingly causing or attempting to cause the death of or physical harm to another and that was committed by discharging a firearm from a motor vehicle * * *."

## Trial Testimony

{¶13} The following evidence was presented at Riley's bench trial:

{¶14} Cleveland Police Officer Kevin Navratil testified that on June 5, 2016, at 2:28 a.m., he and his partner received a dispatch call that shots were fired at the Iron City Café, which is located at 4002 Jennings Road in Cleveland. On their way to the scene, they received a call that a male had been shot. When they arrived at the scene, they saw two males with gunshot wounds on the ground in the parking lot. EMS was already there working on both victims.

{¶15} Officer Navratil interviewed Toni Valenti, a friend of both victims who was at the scene when the shooting occurred. According to Officer Navratil, Valenti said that, as she was walking out of the bar, she saw two males exit a burgundy Nissan Altima and she "felt weird" about this. Valenti turned to go back into the bar and heard gunshots.

{¶16} Officer Navratil also interviewed Dwayne Brown, who said that, as he was walking out of the bar, he "saw a black male wearing a red shirt and white pants approach them and then he started hearing gunshots." Brown also saw a "greenish tan Nissan Altima," with five people in it.

{¶17} Officer Navratil testified that neither witness saw the shooter. Additionally, the police found multiple shell casings in the street and a bullet that had hit a white car in the bar's parking lot.

{¶18} Melanie Edwards testified that she has known Riley, whose nickname is "Wilikgan," for seven or eight years and that she used to buy heroin from him. Melanie also testified that she used to buy heroin from Riley's friends, Matthew and Marcus Burgess. According to Melanie, she had been clean and sober for about a year at the time she testified.

{¶19} Sometime in the summer of 2016, she was driving the Burgess brothers to an undisclosed location near downtown Cleveland. Matthew, who was in the backseat, was talking to Riley on his phone. Melanie testified that she heard their conversation, including what Riley

said through the cell phone. Matthew and Riley "were talking and laughing and joking about who shot who." Asked to explain, Edwards testified that "they wanted to be the person that shot the guy. They were arguing about which one shot him." According to Melanie, both Riley and Matthew took credit for the shooting. Melanie also heard them say that this shooting was a murder outside the Iron City Café.

{¶20} Melanie testified that once Marcus realized that she could hear everything that was being said in that phone conversation, he had her pull over and the Burgess brothers got out of her car. Subsequently, Melanie reported this conversation to the Cleveland police and identified Riley and the Burgess brothers through photographs the police showed her. Melanie also identified Riley, who was wearing a red shirt, white pants, and earrings, in Instagram photos he posted of himself of June 5, 2016, which is the day of the murder at issue. Furthermore, she identified Riley wearing the same outfit from video surveillance footage taken outside of the Iron City Café at the time of the shooting.

{¶21} Melanie testified that one of the detectives suggested that she call Crime Stoppers, and after doing this, she received $1,000 cash in exchange for the information. She also testified that, after she spoke with the detectives, someone shot at the windows of her house, Riley's girlfriend threatened her, and her husband was "jumped" while he was at work. Ultimately, the Cleveland police helped her and her husband relocate outside of the city.

{¶22} Raymond Edwards testified that he is Melanie's husband and they used to buy heroin from Riley and the Burgess brothers. Raymond further testified that in the summer of 2016, he was in the car with his wife and the Burgess Brothers when he learned about a shooting death at the Iron City Café. This was "a day after everything happened." Marcus was on the phone with Riley and "he noticed that we could hear him talking and he said he'll talk to him

later, hung up." Soon after that, Marcus asked Raymond to drive him to Edgewater Park to dispose of a gun. Raymond said no.

{¶23} According to Raymond, his wife reported this to the police, and "right after" that, their house "was shot at a couple of times" and Marcus and another man "tried jumping" him. After this, law enforcement relocated Raymond and Melanie outside the Cleveland area.

{¶24} Saul Varga testified that he was part owner of the Iron City Café at the time the shooting occurred. He was working that night, and after the bar closed, he heard approximately seven to nine gun shots. Although Varga did not see the shooting, he reviewed the bar's surveillance videotapes from that time. The video shows a man getting into the back seat of a four-door sedan, then the car "rolling" out of the bar's parking lot. As the vehicle drives by, seven shots are fired out of the rear window. Varga said he could not see any of the people inside the car, although he could infer there were at least two — one driving and one shooting. From the video, Varga testified that the vehicle was a dark color, possibly "dark reddish." According to Varga, there were about 50 people outside of the bar at the time of the shooting.

{¶25} Toni Marie Valenti testified that she was at the Iron City Café on June 5, 2016, when she ran into her friends Mitchell and Steele just before the bar closed. They all left the bar together and walked out of the door that leads to the front parking lot. Valenti said she saw a man with blonde dreadlocks walk up to another man, who was wearing a "red True Religion V-neck shirt, white shorts and, like, big block earrings," and either shake this man's hand or give him something.

{¶26} A burgundy car pulled up from the parking lot and "stopped right at us." The people inside "were just acting like — just like — just like rowdy, I guess you can say." Someone inside the car said, "F*** them westsiders," and Valenti took that as a threat. Valenti

further testified that she saw this man in the red shirt get "out of that vehicle, and that's the vehicle that obviously was, like, shooting stuff, you know." Valenti specified that the man got out of the driver's side "back seat" of the vehicle. At this point, Valenti and her friends turned and ran, and then heard gunshots. Valenti could not tell who was shooting, but said the shots came from that car.

{¶27} After the shooting, Valenti's friend Devon, who was at the bar with her that night, logged into Instagram, pulled up a picture of a person wearing a red shirt, white shorts, and block earrings, and asked Valenti if this was the man who just shot Mitchell. Valenti believed it was the same person.

{¶28} Subsequently, Valenti identified Riley as the man she saw outside of the Iron City Café on the night of the shooting using that same Instagram picture. At trial, this photograph, along with several other pictures from social media of Riley wearing the red True Religion shirt, white shorts, and block earrings were introduced into evidence. Valenti again identified Riley as the man she saw get out of the car at Iron City Café. The Instagram pictures were dated June 5, 2016.

{¶29} The state also introduced still photographs from the Iron City Café surveillance video on the night of the shooting. When shown a still photo of a man with white shorts, big earrings, and a True Religion shirt on, Valenti identified him as "the person that [got] out of the car that was shooting."

{¶30} On cross-examination, Valenti testified that she did not see the shooter, because she ran away just before the shots were fired. She also testified that she did not see anyone that night with a gun nor did she see Riley get into the car. She only saw him get out of the car.

{¶31} Cleveland Police Detective Raymond Diaz testified that he reviewed the video surveillance footage from the Iron City Café on the night in question. He saw Riley, wearing the red shirt, white shorts, and block earrings, along with two or three other individuals, leave the bar at closing time and walk through the parking lot. The video shows the group get into a vehicle: "There's one in the front driver's seat, one in the front passenger, and Mr. Riley in the back driver's side."

{¶32} The car pulled up to where a group of people, including Valenti, were standing. Riley got out of the back seat of the car, was approached by two men, and "there appears to be communication" between them. Riley got back into the rear driver's side of the car, and as he did so, people

> already start running on the video. Once he gets in the vehicle, those two gentlemen who were by the vehicle walk away. As soon as the door is closing with Mr. Riley in the back driver's door, the vehicle pulls up, and within seconds of it pulling up, right when it gets to the edge of the parking lot there are shots fired from the car.

{¶33} Det. Diaz explained how the video captured the "muzzle flashes" from the gunfire out of the rear driver's window of the car. Cleveland police later recovered bullet casings "right there at the edge of the driveway [and] in the street on Jennings as the vehicle turned left onto the street." Det. Diaz further testified that "it appears to me the gunshots come from the rear driver's side window." Det. Diaz also identified Mitchell "laying on the ground right there in front of that vehicle" after he had been shot.

{¶34} Det. Diaz testified that the witnesses at the scene "were not cooperative" that night other than Valenti and another person giving a description of a light-skinned black male in a red shirt, white shorts, and block earrings. Witnesses also told police that the car involved was a

Nissan, although the color differed from burgundy to green. The surveillance video is black and white, and the footage is grainy enough that the license plate on the vehicle is not clear.

{¶35} However, the next day, Det. Diaz "received information that one of the people involved in this was someone with the Instagram [screen name of] "Wilikgan."" From there, Det. Diaz was able to learn that this was Riley, who had posted pictures of himself "that were time stamped from the day of the incident * * * wearing the exact clothes, the white shorts, the red shirt with the True Religion emblem and the block earrings." Det. Diaz testified that when he interviewed Valenti at the police station, she showed him an Instagram photograph of Riley with the screen name "Wilikgan."

{¶36} Det. Diaz testified that he sent Melanie Edwards to Crime Stoppers after she gave the police information that she overheard a phone conversation in which Riley and Matthew Burgess took credit, so to speak, for killing Mitchell. According to Det. Diaz, "we sent her to Crime Stoppers [because] she was getting threats * * *." Det. Diaz explained that he "actually told the person at Crime Stoppers that we're trying to relocate this witness, she did give us a statement in this case, if you are able to give her some funds."

{¶37} On cross-examination, Det. Diaz testified that there was no direct evidence of who fired the gun that killed Mitchell and wounded Steele. The video footage shows Riley and two other men get in the car. Riley entered through the rear driver's side door. Within seconds, shots were fired from the rear driver's side of the car. However, there is no DNA, fingerprint, or other forensic evidence linking Riley, or anyone else for that matter, to this crime. No gun was recovered and no witnesses saw anyone with a gun. Det. Diaz further testified that there was no direct evidence that Riley was acting in complicity with the other people in the car.

**The Verdict**

**{¶38}** In the case at hand, the court stated the following when it announced its verdict:

There are certain facts here that are undisputed, thanks in large part to the camera surveillance system in place at the Iron City Café.

We know that it was an uneventful night at the bar with no disturbances, fights, or disputes. We know that the patrons of the bar were peaceably exiting the bar around closing time, somewhere after 2 a.m. There are people milling around as some of the cars begin exiting the premises.

From various camera angles on the videos, we see Mr. Riley and his associates. It is clear they are together acting in concert and engaged in the same enterprise.

Mr. Riley is wearing the distinctive clothing shown in the video [and] the Instagram photos as explained in the testimony of the witnesses. There can be no doubt that Mr. Riley was present and that he both exited and re-entered the vehicle prior to when the shots were fired.

There were questions raised concerning a photo array and the fact that none was done in this investigation. There is no requirement that an array be presented. And, based upon the manner in which this investigation proceeded, none was necessary.

The video shows the vehicle in which Mr. Riley is riding exiting the premises at the same time emitting gunfire. Muzzle flashes are seen and have been testified to as well. Those are the only muzzle flashes shown in the video, and there is no testimony of any gunfire from any other source.

Juan Mitchell and Tarez Steele were both struck with bullets from that gunfire.

Mr. Mitchell met an untimely death, and Mr. Steele suffered a foot injury, almost losing his smallest toe.

Despite the video and the testimony of all of the witnesses, it was impossible to determine who among the three or more individuals in that vehicle actually shot the fatal and injuring shots, and whether there was more than one person shooting out of that vehicle.

It appears that the shots were fired from the rear driver's side * * * window, which would suggest that it was Mr. Riley doing the shooting. However, it is impossible to determine beyond a reasonable doubt the specific individual doing the shooting. All of the individuals in that vehicle are equally and legally responsible for these crimes, but only Mr. Riley is before this Court.

The video from the surveillance cameras was the most important evidence in this case, but it was certainly supplemented by the testimony of the witnesses.

The Court has carefully and painstakingly reviewed those videos, along with reviewing all of the exhibits, notes of the testimony of all the witnesses, [and] my recollection of all that testimony in reaching my decision.

The Court, in reviewing the testimony of the witnesses, applied the tests for truthfulness and credibility and has determined the value and weight to be given to each witness' testimony. The Court found the testimony presented by the key witnesses to be credible and compelling.

The Court is not concerned about the issue of a reward paid by Crime Stoppers. That witness required a warrant to be brought in to testify, and the recommendation to speak with Crime Stoppers came after her full statement with the homicide detective. There is nothing to suggest that the order in which those events occurred would cause her testimony to be tainted.

After carefully considering all of the evidence, the Court makes the following findings: Due to the inability to specifically identify the person shooting the gun or guns in this instance, the Court is unable to determine beyond a reasonable doubt the elements of Count 1, aggravated murder, and finds Mr. Riley not guilty of that count.

For the remaining counts, the Court finds Mr. Riley was complicit in the actions

that led to the death of Juan Mitchell and the injuries to Tarez Steele.

## Sufficiency of the Evidence

{¶39} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073,

2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶40} The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

**Manifest Weight of the Evidence**

{¶41} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is

against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶42}** An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**Analysis**

**{¶43}** On appeal, Riley argues that "all of his convictions herein (Counts two through ten) were not based upon legally sufficient evidence. * * * No evidence whatsoever was presented that Mr. Riley had a gun, used a gun or did any single act that would constitute complicity." Furthermore, Riley's arguments under a manifest weight of the evidence theory are based on the same reasoning: There was either no evidence or a lack of credible evidence "placing Riley in the car the shots came from, but assuming for purposes of argument that credible evidence proved he was in the car, there is no evidence to demonstrate that he did any of the things necessary to create criminal liability under a complicity theory."

**{¶44}** R.C. 2923.03(A) defines "complicity" as follows:

No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense * * *;

(4) Cause an innocent or irresponsible person to commit the offense.

**{¶45}** The Ohio Supreme Court further established that, to prove complicity, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.   Such intent may be inferred from the circumstances surrounding the crime."   *State v. Johnson*, 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796 (2001).

**{¶46}** In *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13, the Ohio Supreme Court held that "the state need not establish the identity of the principal in order to convict an offender of complicity."   Although mere presence at the crime scene is insufficient, criminal intent may be inferred from "companionship * * * and conduct of the defendant before and after the offense is committed."   In other words, the evidence must establish that the defendant was more than a mere bystander.   *State v. High*, 8th Dist. Cuyahoga No. 106198, 2018-Ohio-2236, ¶ 34.

**{¶47}** According to Riley, there is no evidence that he had knowledge that a shooting would take place, and the "Court's verdict is based on mere speculation in this regard."   Riley argues that, while the identity of the shooter need not be established, the state must prove "beyond a reasonable doubt that the defendant was more than merely present."   Riley emphasizes that he was acquitted of aggravated murder because of "lack of evidence of identity of the perpetrator," but found guilty of all other counts under a complicity theory.

**{¶48}** Riley further argues that his case is similar to *State v. Bradford*, 8th Dist. Cuyahoga No. 105199, 2018-Ohio-1417, in which this court reversed a defendant's convictions for two firearms-related charges based on insufficient evidence that the defendant was involved in the

drive-by shooting at issue. In *Bradford*, witnesses saw shots fired from a single person holding a gun out of the rear passenger window of a Dodge Charger. *Id.* at ¶ 87. Evidence showed that Bradford's mother owned the Charger and that, based on cell-tower mapping, Bradford's cell phone was in the area of the shooting at the time the shots were fired. *Id.* at ¶ 34, 96.

{¶49} In reversing Bradford's convictions, this court found that the evidence was "insufficient to support the presence" of Bradford at the scene of the crime, noting that "cell mapping * * * does not demonstrate that appellant was personally present" at the shooting. *Id.* at ¶ 99-101. Upon review, we find that the facts of the case at hand are significantly different than the facts presented in *Bradford*.

{¶50} In the instant case, surveillance video shows that Riley was in the car at the time shots were fired from the vehicle. This differs from *Bradford*, because in that case, the evidence put the defendant's cell phone at the scene of the crime, and this court held that this was insufficient to put the defendant himself at the scene of the crime. As the trial court in the case at hand stated, the best evidence is the surveillance video, which shows: Riley walking with a group of men to the bar's parking lot; Riley and two of the men getting into a Nissan Altima, with Riley using the driver's side back door; and Riley exiting the vehicle and talking to two men with dreadlocks, then getting back into the car again using the driver's side back door. The video then shows the car start to pull out of the parking lot and, within seconds, gunfire coming from the back driver's side window. Eyewitness statements corroborate this evidence, although nobody saw who exactly fired the gun. This evidence squarely puts Riley at the scene of the crime.

{¶51} Taking into consideration the complicity statute, we find that the state presented sufficient evidence to convict Riley of the shooting, which resulted in Mitchell's murder and

physical injury to Steele, and the other associated offenses. Riley is seen talking to and walking with the other men who got in the car. Additionally, Riley gets out of the car, talks to two people and possibly takes something from one of them, and gets back in the car. Immediately after this, shots are fired from the rear driver's side of the vehicle, which is where Riley got into the car.

{¶52} Furthermore, we cannot say that Riley's convictions are against the manifest weight of the evidence. Eyewitness testimony from Valenti corroborates what is shown in the video. Testimony from Melanie and Raymond shows that Riley and the Burgess brothers were talking about the murder and each claiming to have been the shooter shortly after the incident. Additionally, Riley's Instagram posts show him wearing the exact same clothing as the person captured on the surveillance video getting into the car immediately prior to when the shots were fired. These photographs are dated June 5, 2016, which is the same day as the offense. We agree with the trial court's assessment of witness credibility, and when considered alongside the indisputable video evidence, weighs in favor of conviction.

{¶53} None of the evidence suggests that Riley was a mere bystander to this drive-by shooting or that he abandoned his criminal purpose before the shots were fired. Prior to the shooting, someone from the group of men who were in the car said, "F*** them westsiders." Riley was the only person to exit and reenter the vehicle before the shots were fired. Riley was sitting in the seat of the car from which the shots were fired. Riley and the Burgess brothers bragged about the shooting the day after it occurred. Thus, a rational trier of fact could infer from this evidence that Riley had a role in the shooting based on his actions, before, during, and after the incident. *See State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th

Dist.1981) ("Evidence of aiding and abetting another in the commission of crime may be demonstrated by both direct and circumstantial evidence.")

**{¶54}** Accordingly, Riley's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Riley's first and second assigned errors are overruled.

## Motion to Strike

**{¶55}** We review the denial of a motion to strike under an abuse of discretion standard. *Abernethy v. Abernethy*, 8th Dist. Cuyahoga No. 81675, 2003-Ohio-1528, ¶ 7. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶56}** Riley argues that "the lower Court erred in failing to strike the identification testimony of Ms. Valenti based upon improper identification procedures."

**{¶57}** Courts apply a two-prong test to determine the admissibility of pretrial identification testimony. *State v. Lennon*, 8th Dist. Cuyahoga No. 104344, 2017-Ohio-2753, ¶ 49. "First, the trial court must determine whether the identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Second, the trial court must determine whether the identification itself was unreliable under the totality of the circumstances." *Id.* If the defendant establishes the first prong, the following factors should be considered to determine whether the identification was nonetheless reliable: "the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of

certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id*. at ¶ 51.

**{¶58}** In the case at hand, Valenti identified Riley via Instagram photos prior to speaking with the police. Det. Diaz testified that when he subsequently interviewed Valenti at the police station, she showed him an Instagram photograph of Riley with the screen name "Wilikgan." In response, Det. Diaz showed Valenti additional pictures of Riley, including his OHLEG [1] photograph, to ensure accuracy of her identification.

**{¶59}** Upon review, we find nothing impermissibly suggestive about this identification procedure, particularly because Valenti first showed a picture of Riley to the police. Accordingly, Riley's third and final assigned error is overruled.

**{¶60}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, PRESIDING JUDGE

---

[1]OHLEG is an acronym for the Ohio Law Enforcement Gateway electronic information network, which is part of the Ohio Attorney General Bureau of Criminal Investigation.

ANITA LASTER MAYS, J., and
RAYMOND C. HEADEN, J., CONCUR